STATE OF CONNECTICUT *v.* GARY RYDER
(SC 18411)

Rogers, C. J., and Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued March 14—officially released August 9, 2011

*Gary Ryder*, pro se, the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *Dina Urso*, assistant state's attorney, and *Ricki Goldstein*, former assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Gary Ryder, appeals[1] from the judgment of the Appellate Court affirming the trial court's denial of his motion to suppress certain evidence obtained as a result of the warrantless search of his home. *State* v. *Ryder*, 114 Conn. App. 528, 969 A.2d 818 (2009). The defendant claims that the Appellate Court improperly concluded that the warrantless search of his house did not violate his right to be free from unreasonable searches and seizures. We agree with the defendant, and, accordingly, we reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts as found by the trial court: "On August 15, 2004, [Andrew Kelly, a police officer] was working the 4 p.m. to 12 a.m. shift. He was ordered out of his daily check out at the beginning of his shift and told to report to dispatch. [Kelly] testified that such a procedure was unusual and done only in cases of emergency situations, such as a motor vehicle accident.

"[Kelly] was informed that the dispatcher received numerous telephone calls from a father in Vermont,

---

[1] We granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the trial court's denial of the defendant's motion to suppress?" *State* v. *Ryder*, 292 Conn. 919, 920, 974 A.2d 723 (2009).

who was sounding increasingly frantic. The father informed the police that his two [teenaged] sons took the train to Greenwich for the weekend to visit friends, that they were supposed to return to Vermont by train at the conclusion of the weekend and failed to do so. The [teenagers] had been missing for approximately twenty-four hours prior to the time the father called the police, during which time the father indicated that he was constantly trying to contact them. The father was finally able to contact . . . [the fourteen year old son] . . . who informed him that . . . [the sixteen year old son] was at the defendant's house in Greenwich.[2] [Kelly] was told by the dispatcher that the . . . father and the defendant previously had a relationship and resided together. [Kelly] also learned from the dispatcher that officers from the prior shift that day went to the defendant's house, spoke with him about the . . . father's claim that his [sixteen year old son] inexplicably failed to return to Vermont and informed him that the father believed that [that son] was at the defendant's residence. The defendant directed the officers to another address where he stated the [sixteen year old son] was staying, which proved to be [incorrect] information.

"[Kelly] proceeded to the defendant's house . . . in Greenwich, which he described as an affluent area of town. He arrived at the house at [approximately] 4:30 p.m. and pulled into the beginning of the gated driveway, [the gate to which] was closed. He immediately noticed from that vantage point that there was a couch that was sticking partly out of the garage onto the driveway and a BMW convertible with its top down parked in the driveway.

---

[2] The record reveals that the ages of the teenagers were undisputed. Kelly testified at the suppression hearing that he believed the teenagers were "over thirteen. I think the ages [were] between thirteen and fifteen or thirteen and sixteen."

"[Kelly], who was dressed in full uniform, used the intercom located at the driveway's entrance, but received no response. . . . [H]e stepped over the . . . [gate] and began to walk around the house, announcing the presence of the police. [Kelly] rang the front doorbell and knocked on the front door to no avail. He then walked around the back of the house and approached a set of French doors. He observed through those doors a cot on which there was a bag of clothes that appeared suitable for a teenager, some video games and an otherwise impeccable house. [Kelly] grabbed the handle, realized that the door was not locked and proceeded to open the door. At that point, he called for backup in accordance with police procedure relative to finding an open door in a residence. . . . Robert Smurlo [another police officer] arrived at the scene within a few minutes and was briefed by . . . Kelly before they entered the residence.

"[Kelly] testified that based on the facts as he knew them to be, he believed that the missing [sixteen year old son] may be in danger inside the house. Important to that belief were the facts of a reportedly missing [teenager], the nature of the couch and vehicle in the driveway area, no response to his repeated calls from outside the house, an unlocked door and the . . . clothes strewn on the cot on the first floor. For those and other reasons, [Kelly and Smurlo] decided to enter the residence . . . to look in places where a [teenager] may be located.

"The officers searched the first floor of the house for the [sixteen year old son] and then proceeded upstairs. At one point . . . Kelly went into a bathroom on the second floor and noticed what appeared to be a dark figure through the bathtub shower door. The glass was frosted. He testified that he believed the dark figure was the missing [son]. In this regard, he testified as follows: I slid the door open to the tub. To the greatest

bit of relief, just a crocodile or a large lizard [was] in the tub. [Kelly] estimated that the reptile was six or seven feet in length.

"[Kelly] closed the shower door, and he and . . . Smurlo continued to search the rest of the residence for the [sixteen year old son]. [Kelly] did not know at the time whether the possession of the reptile in the tub was illegal. The officers, having completed their search . . . exited the residence and left the reptile still in the bathtub where they found it.

"On September 8, 2004, almost four weeks later, the defendant was arrested on charges of risk of injury to a child in violation of General Statutes § 53-21 and illegal possession of a reptile in violation of [General Statutes] § 26-55. On March 6, 2006, the defendant moved to suppress the evidence obtained from the search of his home and to dismiss the charges against him. After a three day suppression hearing, the court denied the defendant's motions. The state entered a nolle prosequi with regard to the charge of risk of injury to a child, and the defendant entered a plea of nolo contendere to the possession of a reptile charge, conditioned on reserving his right to appeal from the court's ruling on his motions to suppress and to dismiss. . . . The [trial] court found that the rulings on the defendant's motion to dismiss and motion to suppress were dispositive of the case for the purposes of General Statutes § 54-94a and Practice Book § 61-6 (a) (2) (i) and sentenced him to pay a $35 fine, which he since has paid." (Citation omitted; internal quotation marks omitted.) Id., 530–33.

The record also reveals the following additional undisputed facts and procedural history. The defendant subsequently appealed to the Appellate Court from the trial court's denial of his motions to suppress and to dismiss. The Appellate Court described his appeal as claiming that "the warrantless search of his house vio-

lated his right to be free from unreasonable searches and seizures" under the state and federal constitutions. *State* v. *Ryder*, 111 Conn. App. 271, 274, 958 A.2d 797 (2008). The state responded that the Appellate Court lacked subject matter jurisdiction over the appeal because the defendant had rendered the appeal moot by paying the fine prior to the hearing before the Appellate Court. Id. The Appellate Court concluded that the defendant's appeal would indeed be moot unless he could demonstrate that he had paid the fine involuntarily or that prejudicial collateral consequences were reasonably possible as a result of his conviction, and, accordingly, remanded the case to the trial court for factual findings as to those two issues. Id., 277–78. On remand, the trial court found that the defendant had paid the fine involuntarily and that there existed a reasonable possibility that the defendant would suffer prejudicial collateral consequences as a result of his conviction. *State* v. *Ryder*, 51 Conn. Sup. 91, 94, 98, 976 A.2d 116 (2009).

In light of the trial court's findings, the Appellate Court determined that it had jurisdiction over the defendant's appeal, and it then reviewed the question of whether the warrantless search of the defendant's home had violated his right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution.[3] *State* v. *Ryder*, supra,

---

[3] Because the defendant failed to provide an independent analysis of his assertion that the search also violated his state constitutional rights, the Appellate Court reviewed only the federal constitutional claim. *State* v. *Ryder*, supra, 114 Conn. App. 534 n.3.

As the dissent points out, the Appellate Court, in *State* v. *Ryder*, supra, 114 Conn. App. 533, did not describe the defendant's claim on appeal as a claim that the warrantless search of his premises violated his right to be free from unreasonable searches and seizures. Instead, the Appellate Court quoted its earlier decision in *State* v. *Ryder*, supra, 111 Conn. App. 274, in which it had addressed only the jurisdictional issue and described the defendant's appeal as claiming that "the warrantless search of his house violated his right to be free from unreasonable searches and seizures." The state, in its brief to the Appellate Court, did not address the issue of the

114 Conn. App. 534–35. The Appellate Court determined that the emergency exception to the warrant requirement justified the officers' entry into the defendant's home. Id., 538–40. Specifically, it concluded that it was objectively reasonable for Kelly to believe that a minor was in need of immediate aid, "[g]iven the frantic telephone calls by an apparently concerned parent, the suggestion, based on the presence of the car and couch in the driveway, that someone was in the defendant's home, the lack of an answer at the intercom and front door and the sight of a teen's belongings on the first floor . . . ." Id., 539. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 540. This appeal followed.

The defendant claims that the Appellate Court improperly determined that the warrantless search of his house did not violate his right to be free from unreasonable searches and seizures under the fourth amendment.[4] He contends that the police intrusion into his house was not warranted under the emergency doctrine because a reasonable police officer in Kelly's circumstances would not have believed that a warrantless

warrantless search at all and, instead, phrased the statement of the issue as: "Does this court have subject matter jurisdiction over the defendant's appeal from his plea of nolo contendere to illegal possession of a reptile . . . ."

[4] The defendant also predicates his claim on article first, § 7, of the constitution of Connecticut. Because the defendant again undertakes no independent analysis of his state constitutional claim, we address only his claim under the federal constitution. See, e.g., State v. Melendez, 291 Conn. 693, 704 n.16, 970 A.2d 64 (2009); State v. Johnson, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008). In addition, we note that the standard of reasonableness governing police conduct under the emergency doctrine is the same under both the federal and state constitutions. State v. Blades, 225 Conn. 609, 624, 626 A.2d 273 (1993).

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

entry was necessary to assist a person in need of immediate aid. The defendant further argues that, even if this court concludes that a reasonable officer would have believed that a warrantless entry was necessary when the officers entered the house, the emergency exception was not satisfied when Kelly stepped over the gate in front of the house into the defendant's curtilage, an area protected by the fourth amendment.[5] The state

---

[5] The dissent repeatedly refers to the defendant's argument that the emergency exception was not satisfied when Kelly stepped over the gate as a "newly raised claim . . . ." It was not; the argument clearly was made to both the trial court and the Appellate Court.

First, although the transcripts of the suppression hearing do not reveal that the defendant specifically used the term "curtilage" in arguing that the entry upon his property was improper, they confirm that the trial court clearly anticipated and understood that the defendant claimed that Kelly had violated his fourth amendment rights by crossing the gate. For example, during the suppression hearing, Kelly, Smurlo and the father testified that a three foot tall, closed security gate needed to be traversed in order to enter the defendant's property and that a stone wall extended across the front of the lawn. Indeed, Smurlo testified that when he crossed over the gate, he understood that he was entering the defendant's "curtilage" and, upon further questioning, agreed that he believed that the term "curtilage" meant an "individual's property intimately connected with the residence itself . . . ." Contrary to the dissent's assertion, this testimony is relevant because it demonstrates that the trial court understood that the curtilage issue had been raised, not because it shows Kelly's belief that an emergency existed when he crossed the curtilage.

The following colloquy further illustrates the court's understanding that this issue was raised at the hearing. During the redirect examination of the father, the prosecutor asked: "What would happen when [the United Parcel Service (UPS)] delivered packages and no one was home? What would they do with the packages?" Rather than allow the father to respond, the trial court interjected and the following colloquy took place:

"The Court: They would leave them at the gate. *I understand the whole issue of the gate,* honestly, and this isn't a jury. I understand the gate doesn't open unless it is opened.

"[The Prosecutor]: Your Honor, the issue is that it is three feet tall and it's for decoration. UPS would leave it right at the front door.

"The Court: So you can argue that.

"[The Prosecutor]: Okay." (Emphasis added.)

Moreover, when the prosecutor asked Smurlo if he had to "scale any walls" to enter the property, the court interrupted: "You said he walked over the [gate]. I got it."

Second, the dissent mischaracterizes the defendant's brief to the Appellate Court as "contain[ing] two passing references to the curtilage surrounding

responds that the Appellate Court correctly determined that the officers' intrusion into the defendant's house was warranted under the emergency doctrine because it was objectively reasonable for the officers to believe that a teenager was in need of immediate assistance.

his residence and his efforts to ensure the privacy of his home . . . ." The defendant clearly raised the curtilage claim before the Appellate Court. For example, his brief argues: "Kelly initiated an entry onto the property across an electric security gate that was affixed to six foot stone walls to either side of the entry gates. . . . [The] large home [was] completely surrounded by walls, security fence and electronic gates. . . . Kelly admit[ted] climbing over the security gates [and] . . . Smurlo admit[ted] breaching the security wall . . . ." "[T]he defendant . . . chose to reside in a home with a measurable setback from the common roadway, a substantial curtilage between that common roadway, beset by security gates, fences and tall stone walls . . . . Access to the defendant's home required . . . a pass code for an electronic gate [or] the necessity of climbing over a wall or entry gate. . . . There was no simply 'ambling' up to the defendant's door absent some proactive and 'physical act' to breach the exterior perimeter."

Although we recognize that, as with many briefs written by pro se parties, the defendant's brief was not a model of organization and clarity, the defendant clearly raised the issue of curtilage before the Appellate Court. The state chose to ignore that issue and stated in its brief that it instead had "elected to focus solely on the jurisdictional defect in the defendant's appeal in order to prudently conserve scarce prosecutorial and judicial resources." Indeed, it appears that, because the state only briefed the jurisdictional issue, after the Appellate Court remanded the case to the trial court and that court had made the relevant findings, the Appellate Court needed "[t]o resolve [the] appeal . . . [by looking] beyond the state's brief to the evidence that the trial court [had] heard and the decision it [had] made." *State* v. *Ryder*, supra, 114 Conn. App. 537.

Third, "[i]t is the established policy of the Connecticut courts to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 549, 911 A.2d 712 (2006). "A party who, unskilled in [legal] matters, seeks to remedy some claimed wrong by invoking processes which are at best technical and complicated, is very ill advised and assumes a most difficult task. Our courts, however, have always been lenient toward such a one, relaxing the rules wherever it can be done with propriety . . . ." *O'Connor* v. *Solomon*, 103 Conn. 744, 745, 131 A. 736 (1926).

We acknowledge that it is the defendant's responsibility to provide an adequate record for review. In the present case, the defendant timely filed a designation of the motions to suppress and to dismiss to be included by the clerk in the record on appeal. The trial court clerk improperly destroyed the file, however, including both of the motions, after the defendant had entered a conditional plea of nolo contendere, specifically reserving the

The state contends that the search did not begin until the officers entered the defendant's house. Alternatively, it argues that Kelly reasonably believed that a warrantless entry was necessary at the time that he stepped over the gate into the defendant's curtilage.[6] We agree with the defendant and reverse the judgment of the Appellate Court.

"[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be dis-

right to appeal from the denial of the motions. On these facts, it would be unfair to penalize the pro se defendant.

[6] During oral argument, the state argued that this court could not reach the issue of whether the area between the gate and the front door constituted curtilage protected by the fourth amendment because neither the trial court nor the Appellate Court had made any determination on that issue. The trial court, however, clearly was aware of the curtilage issue and implicitly determined that the fourth amendment search did not occur until the officers entered the house. See footnote 5 of this opinion.

The state further claims that the curtilage question is outside of the certified question on appeal. The certified question, however, is both broad and vague. See footnote 1 of this opinion. The defendant clearly argued the issue of curtilage in his brief before this court. The state chose not to respond to that argument in its brief to this court, but the issue was discussed during oral argument. Thus, we may address the curtilage claim. See, e.g., *State* v. *Holmes*, 257 Conn. 248, 251–52 n.3, 777 A.2d 627 (2001) (construing certified issue broadly to encompass all of defendant's claims on issue insofar as they were raised in defendant's briefs and at oral argument), cert. denied, 535 U.S. 939, 122 S. Ct. 1321, 152 L. Ed. 2d 229 (2002); *Eldridge* v. *Eldridge*, 244 Conn. 523, 527 n.3, 710 A.2d 757 (1998) (reading certified question broadly to embrace issue raised by plaintiff); *State* v. *Brown*, 242 Conn. 445, 447, 700 A.2d 1089 (1997) (court may address related claims not certified for review in interest of judicial economy); *Schult* v. *Schult*, 241 Conn. 767, 776 and n.8, 699 A.2d 134 (1997) (court may rephrase certified questions to render them more accurate in framing issues that case presents); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 648–49 n.1, 674 A.2d 821 (1996) (same); *Newman* v. *Newman*, 235 Conn. 82, 87, 663 A.2d 980 (1995) (same).

Additionally, as we state in this opinion, "the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 793. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 222, 3 A.3d 806 (2010). Thus, in the present case, we properly consider

turbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. . . . Conclusions drawn from [the] underlying facts must be legal and logical. . . . We must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when they entered the [dwelling] . . . ." (Internal quotation marks omitted.) *State* v. *Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010).

"It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met. Indeed, '[p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed.' *State* v. *Guertin*, 190 Conn. 440, 447, 461 A.2d 963 (1983); *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)." *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "To discourage unreasonable searches and seizures, the evidence obtained as a direct result of that illegal search or seizure, as well as the 'fruits,' or evidence derived therefrom, are excluded from evidence, unless the connection between the 'fruits' and the illegal search has been sufficiently attenuated to be purged of its primary taint. *Segura* v. *United States*, 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." *State* v. *Geisler*, 222 Conn. 672, 682, 610 A.2d 1225 (1992).

Before addressing the issue of whether the warrantless search of the defendant's home was unreasonable, we first consider the question of when precisely the search commenced. The defendant contends that

the curtilage issue as it pertains to the trial court's legal conclusion that the warrantless search was justified by an emergency situation.

the search began when Kelly traversed the gate. He claims that the area between the gate and the front door was curtilage protected by the fourth amendment. In response, the state contends that the search did not begin until the officers entered the defendant's house. Although the state did not brief the issue of whether the area between the gate and the front door was curtilage, it maintained during oral argument that, even if that area was curtilage, Kelly reasonably believed that an emergency situation existed when he traversed the gate. We conclude that Kelly's warrantless search began when he stepped over the gate onto the defendant's curtilage.

"The curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept." *Dow Chemical Co.* v. *United States*, 476 U.S. 227, 235, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986). "[T]he [f]ourth [a]mendment protects the curtilage of a house and . . . the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. . . . [T]he central component of this inquiry is whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." (Citation omitted; internal quotation marks omitted.) *United States* v. *Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987).

The United States Supreme Court has "declin[ed] . . . to adopt a 'bright-line rule' that 'the curtilage should extend no farther than the nearest fence surrounding a fenced house.' . . . Fencing configurations are important factors in defining the curtilage . . . but . . . the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." (Citations

omitted.) Id., 301 n.4. Rather than determine the extent of curtilage based on physical structures such as fences, "curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. . . . We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of [f]ourth [a]mendment protection." (Citations omitted.) Id., 301. The United States Supreme Court has noted, however, that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver* v. *United States*, 466 U.S. 170, 182 n.12, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984) (distinguishing home's protected curtilage as area distinct and separate from constitutionally unprotected open fields). In applying the four factors enumerated in *Dunn*, the United States Court of Appeals for the Second Circuit has recognized that, "two principal questions, objective and subjective," with respect to curtilage must be resolved under the fourth amendment analysis: (1) "whether society would recognize the particular area claimed as within the curtilage of the home"; and (2) "whether the defendant has manifested a subjective expectation of privacy in that area." *United States* v. *Titemore*, 437 F.3d 251, 258 (2006).

Consistent with the foregoing principles of law, many courts have held that areas within a defendant's property, but not located within the house itself, constitute curtilage under the fourth amendment. In *Madruga* v. *Riverside*, 431 F. Sup. 2d 1049, 1056 (C.D. Cal. 2005), the United States District Court for the Central District of California held that a front courtyard fell within the curtilage of the home because it was immediately adjacent to the home, surrounded by a wall that was five feet, four inches tall, and signs warning of a guard dog were posted near closed wooden gates. In addition, in *United States* v. *Charles*, 290 F. Sup. 2d 610, 614 (D.V.I. 1999), aff'd, 29 Fed. Appx. 892 (3d Cir. 2002), the United States District Court for the District of the Virgin Islands held that a doorknob on the front door of a suspect's home was within the curtilage of the home, making the officers' warrantless swipe of residue from the doorknob unconstitutional. Furthermore, in *Quintana* v. *Commonwealth*, 276 S.W.3d 753 (2008), the Supreme Court of Kentucky determined that, when an officer knocked on the front door of a house and no one answered, and the officer then walked into the backyard even though he did not see any back door, the officer went beyond the limits of a proper investigative procedure known as a "knock and talk" and violated the defendant's fourth amendment rights. The court held that the backyard "was within the curtilage of the house and [the defendant] had a reasonable expectation of privacy in it. The officer did not have the right to be there absent a warrant, meaning any information he uncovered there . . . was improper and thereby tainted . . . ." Id., 760–61.

In the present case, we conclude that the area between the gate and the front door was curtilage protected by the fourth amendment. According to the trial court's factual findings, the defendant's house was approximately two or three stories tall. The police could

not drive up to the immediate front of the house because a stone wall, approximately five or six feet high, extended across the front of the property, and an electronic security gate, made out of white fencing posts and located between the road and the interior driveway, was closed. This gate, which the Appellate Court referred to as " 'the low white fence' "; *State* v. *Ryder*, supra, 114 Conn. App. 531; was approximately three feet high. The police could view only the front of the house and the interior driveway when standing at the gate. An intercom was mounted nearby, which allowed the defendant to exclude others from his property, including his interior driveway and front yard. Although the front doors to many homes are accessible by the public, the defendant in the present case had taken steps to bar the public from his interior driveway, front yard and front door. Given the layout, the security precautions taken and the use of the area, we conclude that the defendant had a reasonable expectation of privacy in the area between his front door and the gate. The trial court itself acknowledged this expectation of privacy when it stated that a delivery person would leave packages at the gate. See footnote 5 of this opinion.

Because we conclude that Kelly conducted a warrantless search of the defendant's curtilage when he crossed the gate, we now turn to the question of whether that warrantless search was unreasonable. "[I]t is clear that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions." (Citations omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794.

"[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 691. It is well established in Connecticut that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. *State* v. *Guertin*, supra, 190 Conn. 453; *State* v. *Aviles*, supra, 277 Conn. 293. Specifically, "the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 795. "The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known *at the time of entry*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 619, 626 A.2d 273 (1993).

"[T]he emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is

assessed on a case-by-case basis. . . . The three general categories that the courts have identified as justifying the application of the doctrine are danger to human life, destruction of evidence and flight of a suspect." (Citation omitted; internal quotation marks omitted.) *State* v. *Aviles*, supra, 277 Conn. 294.

Application of these principles leads us to conclude that Kelly's entry onto the defendant's curtilage was not justified by an emergency situation because a reasonable police officer would not have believed that an emergency existed. It was not objectively reasonable for Kelly to believe that a sixteen year old was in need of immediate aid, despite the urgent telephone calls by an apparently concerned parent, the presence of the car and couch in the driveway and the lack of an answer at the intercom and front door.[7] These facts do not provide a sufficient basis for a reasonable belief that an emergency situation existed, and no officer reasonably would have believed that there was a risk of "danger to human life, destruction of evidence [or the] flight of a suspect." Id.

In its brief to this court, the state cites *State* v. *Blades*, supra, 225 Conn. 619–20, in which we stated: "Among the infinitely varied situations in which entry for the purpose of rendering aid is reasonable, one is the search for an occupant reliably reported missing." *Blades*, however, involved a markedly different situation. In *Blades*, the police officer received repeated calls from close

---

[7] The Appellate Court regarded the warrantless search to have begun when the officers entered through the back door of the house and, accordingly, considered Kelly's sight of a teenager's belongings on the first floor in its determination of whether the search was unreasonable. *State* v. *Ryder*, supra, 114 Conn. App. 539. Because we conclude that the search began when Kelly traversed the gate, we do not take into account his sight of a teenager's belongings. Even if we did consider such an observation, it would not lead an officer to conclude reasonably that he could dispense with the necessity of obtaining a warrant supported by probable cause in accordance with the dictates of the fourth amendment.

family members relaying their concern over the disappearance of a woman who had endured many years of domestic abuse from her husband, who was addicted to "crack" cocaine, had been suspended from work, blamed his wife for the severe burns and permanent injuries that his daughter had suffered in a fire at a friend's house, recently had lost his grandparents, brother and uncle within a short period of time and had unexpectedly returned home to his wife after abandoning the family home a month earlier. Id., 611–13. In addition, the wife had told her daughter that she was afraid of the defendant and wanted a divorce and a restraining order, but the defendant had threatened to harm her if she ever left him. Id., 612. The trial court in *Blades* specifically found that the officer had received repeated telephone calls from the wife's mother, informing him about the couple's marital problems and saying that " 'I think something has been done to her.' " Id., 615. The officer then received calls from the defendant's sister, who reiterated the information that had been given by the wife's mother. Moreover, when the officer in *Blades* arrived at the apartment building where the defendant lived, he saw a blood smear on the interior side of the apartment building door. Id., 616. The present case does not involve similar facts; there was no evidence that the sixteen year old son was in any danger.

We acknowledge that, "[a]mong the infinitely varied situations in which entry for the purpose of rendering aid is reasonable, one is the search for an occupant reliably reported missing." Id., 619–20. *Blades*, however, involved more than a reliable report of a missing person; it involved a person who had been subjected to spousal abuse and threatened by that abuser. Telephone calls from a father who is upset that a teenaged son has not returned his calls or arrived at home at the appointed hour, do not rise to the level of a reliable report of a

missing person, let alone a child whose health or safety is at risk.[8] In the present case, neither the father nor the located fourteen year old son ever suggested to the police that the sixteen year old son was in danger or likely would be harmed or injured in any way. If a report that a teenager has neither returned a parent's calls nor come home on time suggested an "emergency," an emergency situation would exist at some point in almost every household with a teenager and the police constantly would be barging into homes in search of these "missing" teenagers. Although a parent is understandably concerned about the safety and whereabouts of his or her teenager, and a call from such a parent understandably creates a sense of urgency, Kelly also had been told that the teenaged boys had travelled from Vermont to Connecticut by train, presumably without the supervision of their father, that the father and the defendant previously had been in a personal relationship and had resided together and that the father already had been able to contact the fourteen year old son, who had informed him that the sixteen year old son was at the defendant's house. These facts in no way suggest an emergency; rather, they suggest that both the "missing" sixteen year old son and the defendant were not at home on a sunny Sunday afternoon in the summer.[9]

---

[8] Although not found by the trial court, the father admitted that, after the police had located the fourteen year old son, confirmed his safety and spoken with the defendant at his home, they informed him around 1 p.m. on August 15, 2004, that they could not assist him any further unless he filed a missing person's report. We cite this admission because it demonstrates that the police clearly understood, and indeed informed the father, that this was not a case of a missing person.

[9] The state cites *State* v. *Jones*, 24 Kan. App. 2d 405, 947 P.2d 1030 (1997), in support of its proposition that the emergency exception to the warrant requirement justified the warrantless search. In *Jones*, the Court of Appeals of Kansas held that the warrantless search of a home was justified when parents informed the police that they had not heard from their son in three days, that he uncharacteristically had missed a dinner appointment with them and had failed to answer his telephone or return their messages, and recently made an acquaintance of whom he was afraid. Id., 415. Notably, although the court ultimately concluded that the warrantless search was

Although we laud the officers' attempts to locate the sixteen year old son, we see no reason why a reasonable officer would feel compelled to believe an emergency existed that required him to enter the defendant's home. In addition, we note that whether the sixteen year old son had his father's permission to visit the defendant— the father's estranged, former live-in boyfriend—in no way suggests that an emergency existed. The possibility that a sixteen year old son is disobeying his father does not imply a "danger to human life, destruction of evidence [or the] flight of a suspect." *State* v. *Aviles*, supra, 277 Conn. 294. Rather, a disobedient teenager is commonplace and a reasonable officer would not believe it his duty to intrude suddenly onto private property, enter a home in search of a disobedient sixteen year old and return him to his parents.

We do not read our prior case law applying the emergency exception to the warrant requirement "to require direct evidence of an emergency situation . . . ." *State* v. *Colon*, 272 Conn. 106, 147, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). We do require, however, that officers know *some* facts at the time of entry that would lead them to reasonably conclude that they could dispense with the necessity of obtaining a warrant supported by probable cause in accordance with the dictates of the fourth amendment. Here, the officers knew no such facts.

In addition to the father's telephone calls regarding his sixteen year old son, Kelly believed that an emergency existed because of the presence of the car and

justified, it stated that "[i]f there had been additional facts to strengthen the picture of concern, the question would be easier." Id., 416. Not only did the facts in that case provide very weak support for application of the emergency exception, but the facts in the present case are even less compelling. The present case does not involve a person who uncharacteristically failed to contact his family for days at a time or was reportedly fearful of anyone he knew.

the couch in the driveway and the lack of an answer at the intercom and front door. The presence of a convertible car with its top down while parked in a gated driveway in an affluent neighborhood on a sunny Sunday afternoon in no way suggests that someone is home, and certainly does not imply an emergency. It is common to find a parked car in a driveway, and drivers sometimes leave their convertible tops down, unintentionally or not. With regard to the couch, homeowners move furniture periodically, and their decisions to do so are personal, not suspect. Furthermore, given the totality of the circumstances in the present case, the lack of an answer at the intercom should have led to the reasonable belief that no one was at home, rather than to the belief that an emergency existed. In sum, these facts, taken altogether, did not create a reasonable belief that an emergency situation existed, and did not justify Kelly's entry into the defendant's curtilage.[10] We therefore conclude that the emergency exception to the warrant requirement did not justify the warrantless search of the defendant's curtilage and the subsequent warrantless search of the defendant's home.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to grant the

---

[10] We disagree with the dissent's suggestion that this ruling may inhibit officers in the performance of their duties when they reasonably believe that a child is in danger. We do not expect this ruling to have any such chilling effect. Indeed, we emphasize that an officer should not hesitate to perform warrantless searches and seizures when faced with a true emergency or a reasonable belief that a "danger to human life, destruction of evidence [or the] flight of a suspect" is at risk. *State* v. *Aviles*, supra, 277 Conn. 294. Given the specific facts and circumstances of the present case, however, the police had no reason to believe that an emergency situation existed. The risk the dissent seems to suggest is that a police officer, having a reasonable belief that someone's life or safety is at risk, would fail to act because of fear that evidence of some unknown and unsuspected criminal activity would be suppressed. This concern is not reasonable.

defendant's motions to suppress and to dismiss the charges, and to render judgment thereon.

In this opinion PALMER, ZARELLA, and VERTE-FEUILLE, Js., concurred.

ROGERS, C. J., dissenting. I agree with Justice Eveleigh's conclusion that, under the totality of the circumstances, Officer Andrew Kelly made a permissible warrantless entry onto the property of the defendant, Gary Ryder. I write separately because I agree with the majority that the defendant's argument that the fourth amendment was implicated at the time Kelly stepped over the security gate onto the defendant's curtilage is not a newly raised claim and is properly before this court. A thorough review of the trial transcripts persuades me that the questions whether the defendant sought to secure the privacy of his curtilage, and whether Kelly had a reasonable belief that an emergency existed at the moment he entered thereon, were distinctly raised at trial, as required by Practice Book § 60-5.[1] Moreover, although I agree that it would have been preferable for the pro se defendant to have sought an articulation, I believe the trial court's findings, together with the undisputed facts in the record, provide an adequate basis for reviewing the curtilage issue. On the basis of that record, I join Justice Eveleigh in concluding that a reasonable police officer could have believed that an emergency existed when he entered the defendant's curtilage. Accordingly, I respectfully dissent.

EVELEIGH, J., with whom ROGERS, C. J., joins, dissenting. I respectfully dissent. I disagree with the major-

---

[1] Because the state did not retain the defendant's motion to suppress, the defendant, through no fault of his own, is unable to demonstrate that he formally raised the curtilage issue with the trial court.

ity's conclusion that the entry of the police onto the property of the defendant, Gary Ryder, "was not justified by an emergency situation because a reasonable police officer would not have believed that an emergency existed." Contrary to the majority, and consistent with both the decisions of the Appellate Court and the trial court, I would conclude that, under the totality of the circumstances, Andrew Kelly, an officer of the Stamford police department, made a justifiable warrantless entry onto the property of the defendant. Specifically, I would conclude that, on the basis of the facts known to him at the time of entry, Kelly had an objectively reasonable belief that an emergency situation existed, namely, that a missing minor was in need of immediate aid or assistance within the defendant's residence. Accordingly, I would affirm the judgment of the Appellate Court upholding the trial court's denial of the defendant's motion to suppress.

I

I begin by noting the majority's decision to resolve this appeal on the basis of the defendant's newly raised claim that Kelly's "warrantless search began when he stepped over the [security] gate onto the defendant's curtilage" and, therefore, that the reasonableness of Kelly's belief that an emergency situation existed must be evaluated at that moment. I disagree. First, the defendant failed to raise this claim before the trial court in his motion to suppress.[1] As a result, the issue was not the focus of testimony, evidence or argument during the hearings on that motion.[2] The proceedings before

[1] Because the defendant initially pleaded nolo contendere, the defendant's file was culled, including his motions to suppress and dismiss filed with the Superior Court. Efforts to reconstruct all of the contents of the file were unavailing, and as a result the motions to suppress and to dismiss are not contained in the record before this court.

[2] Robert Smurlo, the second Stamford police officer that arrived at the defendant's residence, testified at the suppression hearing and used the term "curtilage" when explaining his vantage point in viewing the defendant's property. Smurlo admitted that he understood the term to include property

the trial court instead focused on the validity of Kelly's warrantless search by examining the basis for, and reasonableness of, his belief that an emergency situation existed at the moment that he entered the defendant's residence through a set of French doors. Accordingly, the trial court, in its memorandum of decision denying the motion to suppress, did not make specific findings of fact regarding the scope and nature of the defendant's curtilage.

Moreover, and significant to appellate review, the trial court was not required to evaluate the validity of Kelly's warrantless search at the moment that he entered the defendant's curtilage. This necessarily would have entailed that the trial court make factual findings as to Kelly's exact knowledge at that moment, and a conclusion as a matter of law regarding whether Kelly's belief that an emergency existed was objectively reasonable at that same moment. As this court has oft stated, "[i]t is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court."

intimately connected to a residence and that his knowledge stemmed from his police training. Smurlo admitted, however, that he had no legal training and that he had no basis to state a legal opinion. The majority concludes that Smurlo's statements support a resolution of the present appeal on the basis of the defendant's newly raised curtilage claim. I disagree. Smurlo's understanding of the nature of the defendant's curtilage is not germane to the present appeal, as neither the trial court nor the Appellate Court focused on the reasonableness of Smurlo's belief that an emergency existed or the basis of his knowledge supporting such a belief. Both courts only made passing reference to his presence at the defendant's residence and instead focused on the reasonableness and basis of Kelly's belief that an emergency existed. Indeed, after mentioning Smurlo in a footnote, the remainder of the majority opinion focuses on Kelly, the extent of his knowledge concerning the missing minors and the reasonableness of his belief that an emergency situation existed. Accordingly, I would not consider Smurlo's statements in determining whether to resolve the present appeal on the basis of the defendant's newly raised curtilage claim.

(Internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 351, 999 A.2d 713 (2010). Moreover, "[a]s is always the case, the [appellant], here the [defendant], bear[s] the burden of providing a reviewing court with an adequate record for review. *Cable* v. *Bic Corp.*, 270 Conn. 433, 442, 854 A.2d 1057 (2004), citing Practice Book § 61-10. It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 379, 999 A.2d 721 (2010).

The defendant, in one and one-half pages of his brief to this court, raises for the first time the curtilage issue that he claims warrants reversing both the judgments of the Appellate Court and the trial court. In its brief, the state did not respond to the defendant's attempt to improperly raise this claim for the first time, and the state further contended at oral argument before this court that we should not consider the claim because neither the trial court nor the Appellate Court addressed it. Accordingly, I would not consider the defendant's newly raised claim that the warrantless search commenced when Kelly entered the curtilage of his residence because doing so would "permit [the defendant] to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court . . . to address the claim—[and] would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *State* v. *Dalzell*, 282 Conn. 709, 720, 924 A.2d 809 (2007); see also *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 580, 941 A.2d 248 (2008) (declining, on basis of ambuscade of trial court, to review pro se

habeas petitioner's newly articulated claim); *Seymour* v. *Region One Board of Education*, 274 Conn. 92, 105, 874 A.2d 742 (rejecting, on basis of trial by ambuscade, pro so appellant's standing claim articulated for first time on appeal), cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005).

Second, the defendant also did not raise this claim on appeal to the Appellate Court. Although the defendant's brief to the Appellate Court contains two passing references to the curtilage surrounding his residence and his efforts to ensure the privacy of his home, the defendant did not claim that the judgment of the trial court should be reversed on the basis of his present claim that the warrantless search commenced when Kelly entered the defendant's curtilage. See *State* v. *Ryder*, 114 Conn. App. 528, 533, 969 A.2d 818 (2009) ("[o]n appeal, the defendant contends that the warrantless search of his *house* violated his right to be free from unreasonable searches" [emphasis added; internal quotation marks omitted]). The issue before the Appellate Court was, instead, "whether the defendant's fourth amendment rights were violated by the warrantless search of his *home*"; (emphasis added) id., 534–35; and, in "resolv[ing] this appeal, the [Appellate Court looked] . . . to the evidence that the trial court heard and the decision it made." Id., 537. Accordingly, because the defendant in the present case failed to raise this issue before the Appellate Court, I would not consider it as a basis to reverse that court. See *State* v. *Duhan*, 194 Conn. 347, 354–55, 481 A.2d 48 (1984) (failure to raise issue before Appellate Court is ground to deny review in this court).

Third, the defendant's newly raised curtilage claim is outside the purview of his petition for certification, which this court granted limited to whether "the Appellate Court properly affirm[ed] the trial court's denial of

the defendant's motion to suppress?"[3] *State* v. *Ryder*, 292 Conn. 919, 920, 974 A.2d 723 (2009). Although the certified issue broadly questions whether the judgment of the Appellate Court was proper, it does not permit an appellant to assert a claim on appeal not previously raised or otherwise waived. Rather, the scope of this court's review on a certified question is limited to determining whether the Appellate Court, *on the basis of the claims before it,* properly reached its conclusion. "It is well settled that, in a certified appeal, the focus of our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo. The only questions that we need consider are those squarely raised by the petition for certification, and we will ordinarily consider these issues in the form in which they have been framed in the Appellate Court." (Internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007); see also *State* v. *Nunes*, 260 Conn. 649, 658, 800 A.2d 1160 (2002) ("on a certified appeal, our focus is on the judgment of the Appellate Court . . . and we ordinarily do not review claims not raised therein" [citation omitted]); *State* v. *Fausel*, 295 Conn. 785, 793, 993 A.2d 455 (2010) (noting this well settled principle applies in appeal involving emergency exception to warrant requirement). Accordingly, I would conclude that the judgment of the Appellate Court should not be reversed on the basis of a claim that, regardless of its merit, was never presented to the Appellate Court as a ground for reversing the trial court.[4]

[3] At oral argument before this court, the state contended that because the defendant had failed to raise the curtilage claim before the trial court or the Appellate Court, the issue was outside of the certified question and this court should decline to review it.

[4] The defendant failed to preserve this claim before the trial court or the Appellate Court, and he has not asked this court to review this claim pursuant to the bypass doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Lastly, I acknowledge that "[i]t is the established policy of the Connecticut courts to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party." (Internal quotation marks omitted.) *New Haven* v. *Bonner*, 272 Conn. 489, 497–98, 863 A.2d 680 (2005). It is equally true, however, that "[a]lthough we allow pro se litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) Id., 498. As part of the requirement of complying with the rules of procedure and substantive law, a self-represented party generally must raise an issue before the trial court and obtain a ruling on that issue in order for that party to preserve the claim for appellate review. See id. In the present case, although the defendant is self-represented before this court and was also self-represented before the Appellate Court, he was represented by counsel at all times during the suppression hearing and before the trial court in the proceedings culminating in his original entry of a plea of nolo contendere. In light of the prejudice to the state, the circumstances of this case and this court's jurisprudence, I would conclude that the defendant's present self-represented status does not excuse his failure to raise the curtilage claim before the trial court.

For all of the foregoing reasons, I would decline at this late stage in the proceedings to review the defendant's newly raised claim that Kelly's warrantless search commenced when he entered the defendant's curtilage because that claim was not preserved at trial, was not raised before the Appellate Court and was not set forth in the defendant's petition for certification to appeal to this court.

II

Although I disagree with the majority's resolution of this appeal on the basis of the defendant's newly raised claim, even assuming, arguendo, that this claim is properly before this court, I additionally disagree with the majority's conclusion that Kelly's warrantless search was not justified because a reasonable police officer would not have believed that an emergency existed when he entered the defendant's curtilage. Specifically, I disagree with the majority's conclusion that "[i]t was not objectively reasonable for Kelly to believe that a sixteen year old was in need of immediate aid, despite the urgent telephone calls by an apparently concerned parent, the presence of the car and couch in the driveway and the lack of an answer at the intercom and front door." I would instead conclude that, on the basis of the facts set forth in the trial court's memorandum of decision, Kelly had an objectively reasonable belief that an emergency situation existed at the moment he entered the defendant's curtilage, namely, that the missing sixteen year old may have been in need of immediate aid or assistance within the defendant's residence.

I begin by noting my agreement with the majority opinion's discussion of our standard of review and governing legal principles. I also agree with the statement of facts set forth in the majority opinion, which I will therefore not repeat in full in this dissent.[5] I further note that, despite the defendant's strenuous claims to the contrary, the majority does not conclude that any of the trial court's findings of fact were clearly erroneous. Accordingly, the majority and I are in agreement as to the facts known by Kelly at the moment that he entered the defendant's curtilage. Nonetheless, the following

---

[5] The statement of facts set forth by the majority is adopted from the opinion of the Appellate Court, which adopted those facts from the trial court's memorandum of decision.

facts known by Kelly must be emphasized in order to properly determine whether he possessed an objectively reasonable belief that an emergency situation existed at the moment that he entered the defendant's curtilage.

At approximately 4 o'clock in the evening on August 15, 2004, Kelly was pulled from his normal check-out process, something that only happened in emergencies. Kelly learned from a police dispatcher that a father in Vermont had telephoned several times about being unable to contact his sons, and that the father had sounded more frantic with each call. Kelly also learned: the sons were supposed to have taken a train that day from Greenwich to return to Vermont, but that they had not returned; twenty-four hours had passed since the father's first call to the police relaying he could not contact his sons, and that during those twenty-four hours he had constantly tried to contact them; the father finally had managed to contact one of the sons, who stated that his brother was at the defendant's residence; officers previously had spoken with the defendant at his home and he had told them that he did not know the location of the missing boys; on a later occasion the defendant had, however, provided an address where the missing boy might have been, but that information proved to be inaccurate at that time;[6] and there had been a prior relationship between the defendant and

_____

[6] When another officer went to the address provided by the defendant, no one was home. Although the address provided by the defendant ultimately proved to be the location where the missing sixteen year old had stayed at some point during the weekend, that fact was not known by the police until hours after Kelly had entered the defendant's property. Because, however, this court determines the reasonableness of a warrantless search based on the facts known at the time of entry; *State* v. *Blades*, 225 Conn. 609, 619, 626 A.2d 273 (1993); it is of no moment that the missing sixteen year old had in fact been at that location at some point in time because Kelly did not have that information when he entered the defendant's curtilage. See, e.g., *State* v. *Fausel*, supra, 295 Conn. 800 ("it is of no moment that it turns out there was in fact no emergency" [internal quotation marks omitted]).

the boys' father. From this information, Kelly testified that he was under the impression that a boy was missing and that he was a minor between the ages of thirteen and sixteen.

After learning this information, Kelly proceeded to the defendant's residence, arriving at approximately 4:30 p.m. The driveway from the street to the residence was blocked by a low white gate and Kelly exited his marked police cruiser. Kelly then made the following observations: the garage door was open; a couch of the type that would normally be found indoors was partly sticking out of the garage onto the driveway; and a convertible parked in the driveway had its top down. Kelly then made several attempts to contact anyone inside the residence using an intercom located at the gate, but no one responded. Kelly then proceeded to step over the low white gate and enter the defendant's curtilage, as he proceeded toward the defendant's residence.

In explaining the nature of the emergency exception to the warrant requirement, this court recently stated that "[t]he emergency exception to the warrant requirement allows police to enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 794. "The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Internal quotation marks omitted.) Id., 75, quoting *State* v. *Geisler*, 222 Conn. 672, 691–92, 610 A.2d 1225 (1992).

Despite the rigorous requirements of the emergency exception, "[t]he reasonableness of a police officer's determination that an emergency exist[ed] is evaluated on the basis of facts known at the time of entry." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 143, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Accordingly, as a reviewing court, "[w]e must determine, therefore, whether, on the basis of the facts found by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed when [Kelly] entered the [the defendant's curtilage] . . . . In addition, we [must be] mindful that [i]t is well settled that, in a certified appeal, the focus of our review is not on the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Fausel*, supra, 793.

On the basis of the facts known to Kelly, and pursuant to our standard of review and governing principles, I would conclude that he possessed an objectively reasonable belief that an emergency situation existed at the moment that he entered the defendant's curtilage. From the onset, Kelly was presented with information from which an objectively reasonable officer could have adduced that an emergency situation existed. First, Kelly was removed from check-out, something only done in emergencies, and told that an increasingly frantic father had been unable to contact the missing sixteen year old for the preceding twenty-four hours. Second, and most significantly, Kelly learned that the fourteen year old son had told police that the missing sixteen year old son was at the defendant's residence, that the defendant had first denied knowing the location of the sixteen year old and had later provided an address where the sixteen year old might be located, but that the information proved inaccurate.

In possession of information indicating that a minor was missing and might be located at the defendant's residence, Kelly proceeded directly to the defendant's house. Upon arrival, Kelly observed a convertible vehicle with its top down, an open garage door and a couch sticking out of the garage and partly into the driveway. As Kelly testified at trial, his observations at the defendant's residence, in addition to his prior knowledge, made him concerned that the missing sixteen year old was in need of immediate aid or assistance inside the residence. Specifically, Kelly explained that the open garage and couch partly sitting in the driveway were out of place in comparison to the rest of the defendant's home and the affluent neighborhood where he lived. Kelly also testified that, on the basis of his understanding that earlier in the day the defendant had sent officers to a location where the missing sixteen year old was not located, and in combination with his observations that things seemed amiss at the defendant's residence—including the couch in the driveway, the open garage, the presence of a convertible with the top down and the silence in response to his intercom calls—he believed that the defendant may have been attempting to flee and that the sixteen year old was inside the residence and in need of aid.

This court previously has stated that "[a]mong the infinitely varied situations in which entry for the purpose of rendering aid is reasonable, one is the search for an occupant reliably reported missing." *State* v. *Blades*, 225 Conn. 609, 619–20, 626 A.2d 273 (1993). In *Blades*, this court rejected the defendant's contention that the evidence supporting the warrantless search of his apartment was "nothing more than a missing person investigation . . . ." (Internal quotation marks omitted.) Id., 620. Similar to the present case, over the course of more than two hours, the officer in *Blades* had received telephone calls from relatives of the missing

victim, the defendant's wife, worried about her where-
abouts and welfare. Id. From these calls, the officer
learned that the victim and the defendant had a troubled
marriage and that the defendant had given relatives a
"patently false reason" why he had sent his children
unattended by train to New York. Id. Additionally, when
police first went to the defendant's apartment, he told
police that his wife had left for New York earlier that
day, a fact which further investigation failed to substan-
tiate. Id., 615. On the basis of these facts, the police
determined that it was necessary to enter the defen-
dant's apartment without a warrant because there was
reason to believe the victim may have been injured or
in danger. Id., 615–16. Upon arriving at the defendant's
building, an officer observed a blood-like smear on the
interior door to the common hallway of the building;
id., 616; an observation that this court stated "further
heightened" the officer's preexisting belief that the vic-
tim may be in need of immediate aid. Id., 621.

I would conclude that, on the basis of the information
relayed to Kelly, the sequence of events in the present
case, like that in *Blades*, rose to the level of a reliable
report of a missing minor, who may have been seques-
tered at the defendant's residence and in need of aid
or assistance.[7] Specifically, Kelly knew that the fourteen

[7] The majority opinion states that "[a]lthough . . . [such calls from a
parent] understandably [create] a sense of urgency, Kelly also had been told
that the teenaged boys had travelled from Vermont to Connecticut by train,
presumably without the supervision of their father, that the father and the
defendant previously had been in a personal relationship and had resided
together and that the father already had been able to contact the fourteen
year old son, who had informed him that the sixteen year old son was at
the defendant's house. These facts in no way suggest an emergency; rather,
they suggest that both the 'missing' sixteen year old son and the defendant
were not at home on a sunny Sunday afternoon in the summer." I disagree
with this conclusion, which fails to reference all of the facts found by the
trial court and also fails to consider the urgency suggested by the conflicting
facts concerning the location of the missing sixteen year old. I note, specifi-
cally, the fourteen year old son's statement that the missing sixteen year
old was at the defendant's house, the defendant's earlier denial that he knew
where the sixteen year old was and subsequent provision of an apparently

year old son had stated that the missing sixteen year old was at the defendant's residence, and yet the defendant had denied knowing where the missing sixteen year old was and, in fact, had offered an address that proved inaccurate. These facts logically permitted Kelly to draw the inference that the defendant may have been less than forthcoming with, if not misleading to, the police, and that the scene at the defendant's residence indicated a person possibly preparing for flight or attempting to remove evidence.

As this court previously has cautioned, "we do not read [prior case law applying the emergency exception to the warrant requirement] to require direct evidence of an emergency situation . . . ." *State* v. *Colon*, supra, 272 Conn. 147. "This standard must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise. This means, of course, that it is of no moment that it turns out there was in fact no emergency." (Internal quotation marks omitted.) *State* v. *Fausel*, supra, 295 Conn. 800, quoting 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 6.6 (a), pp. 452–53. This is true because "the emergency exception to the warrant requirement arises out of the caretaking function of the police," which includes "aid[-ing] individuals who are in danger of physical harm,

---

inaccurate address, and that the defendant and the father had a prior relationship. Although the majority's language suggests that the relationship between the defendant and the father remained positive and that the missing sixteen year old was simply visiting a family friend, and although Kelly did not testify that he was aware of the nature of the relationship between the defendant and the father at the time of this incident, the father testified at the suppression hearing that his relationship with the defendant was, in fact, very acrimonious and that he had explained this to police dispatch in his calls.

[and] assist[ing] those who cannot care for themselves . . . ." *State* v. *Fausel*, supra, 295 Conn. 800–801, quoting 3 W. LaFave, supra, § 6.6, p. 451.

Despite these important principles guiding our review, the majority concludes that Kelly's belief that an emergency existed was objectively unreasonable. As a result, I am concerned about the potentially chilling effect this ruling may have on police officers' decision-making processes in the future regarding potential emergency situations. Indeed, in my view, an officer presented with the aforementioned information and observations may have been derelict in his or her duty if that officer, upon receiving no response at the intercom, had simply turned around and returned to the police station. As a result of the majority's decision, will officers demand heightened evidence of an emergency before responding to citizens' concerns that someone is in danger of physical harm or in need of assistance? Will officers, acting in their community caretaking role, be more hesitant to make warrantless searches for fear that their "prompt assessment of sometimes ambiguous information concerning potentially serious consequences"; *State* v. *Fausel*, supra, 295 Conn. 800; proved, in judicial hindsight, to be misplaced?

"In the cool morning of appellate review [this court will] not ignore the heated passion of immediacy that was the essence of the anxious concerns about the [sixteen year old's] safety and well-being . . . ." *State* v. *Blades*, supra, 225 Conn. 621. Accordingly, on the basis of the facts known by Kelly when he entered the defendant's curtilage, I would conclude that Kelly possessed an objectively reasonable belief that an emergency situation existed, namely, that the missing sixteen year old was in need of immediate aid or assistance within the defendant's residence. I therefore respectfully dissent from the majority's conclusion that, under the facts of this case, Kelly's belief was objectively

unreasonable and, consequently, his warrantless entry onto the defendant's curtilage was unjustified.

Because the majority concludes that the warrantless search commenced at the moment Kelly entered the defendant's curtilage, and because the majority concludes that Kelly lacked an objectively reasonable belief that an emergency existed at that moment, the majority does not take into account Kelly's additional observations and actions culminating in his entry into the defendant's residence and discovery of the reptile, which the defendant challenged through his motion to suppress. Because I would affirm the judgment of the Appellate Court, I consider these additional facts in determining whether Kelly justifiably searched the defendant's residence without a warrant, because he possessed an objectively reasonable belief that an emergency situation existed within the defendant's residence pertaining to the missing sixteen year old.

I set forth, therefore, the following additional relevant facts, as set forth in the opinion of the Appellate Court and as found by the trial court. "[Kelly] stepped over the low white fence and began to walk around the house, announcing the presence of the police. [Kelly] rang the front doorbell and knocked on the front door to no avail. He then walked around the back of the house and approached a set of French doors. He observed through those doors a cot on which there was a bag of clothes that appeared suitable for a teenager, some video games and an otherwise impeccable house. [Kelly] grabbed the handle, realized that the door was not locked and proceeded to open the door. At that point, he called for backup in accordance with police procedure relative to finding an open door in a residence. [Robert Smurlo, another Stamford police officer] arrived at the scene within a few minutes and was briefed by [Kelly] before they entered the residence." *State* v. *Ryder*, supra, 114 Conn. App. 531–32.

In my view, Kelly's observations of clothing suitable for a teenager, the unmade bedding on the makeshift cot and the presence of videogames, in apparent contravention of the defendant's earlier statement to police that he did not know where the missing sixteen year old was, as well as the defendant's attempt to direct the police to a different, apparently inaccurate address, buttressed the evidence available to Kelly, and led him to reasonably believe that the missing sixteen year old was inside the defendant's residence and in need of aid or assistance. In *Blades*, this court concluded that the officer's observation of a blood-like smear on an interior door to the common hallway of the defendant's building served to further heighten the officer's belief that the victim was in need of immediate aid and that a warrantless search was required. *State* v. *Blades*, supra, 225 Conn. 621. Similarly, in my view, Kelly's additional observations permissibly "further heightened" his belief that the missing sixteen year old was sequestered within the defendant's residence, that the minor may have been injured or otherwise unable to respond to the intercom, doorbell and Kelly's verbal announcements of "police," and that the defendant had twice been untruthful to the police when he previously had stated that he did not know where the sixteen year old was and had provided an address as to his possible location that proved inaccurate. Pursuant to our standard of review and governing principles, I would conclude, on the basis of these additional facts, and in conjunction with the previously discussed information known by Kelly, that he possessed an objectively reasonable belief that an emergency situation existed within the defendant's residence at the moment Kelly entered the residence through the set of unlocked French doors.

For all of the foregoing reasons, I would affirm the judgment of the Appellate Court upholding the trial court's denial of the defendant's motion to suppress.