******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* SHAILA M. CURET
## (AC 41372)

Prescott, Devlin and Bear, Js.*

*Syllabus*

Convicted, on a conditional plea of nolo contendere, of possession of narcotics with intent to sell, the defendant appealed to this court. Z, a police officer, responded to a 911 call of an attempted robbery and report of gunshots made by C, a resident of the defendant's apartment building. C reported seeing two men enter the building and then heard loud knocking on the door of the defendant's apartment, followed by an altercation that started in front of the defendant's apartment and moved to the laundry room, which was directly beneath C's apartment. C informed the 911 dispatcher that he believed someone had tried to break into the defendant's apartment and that the two men he had observed enter the building had later fled in two separate vehicles. He also indicated that he had discovered a knife. When Z arrived at the apartment building, he spoke with C regarding the incident and then conducted an investigation of the building. Z observed pry marks and fresh paint chips on the floor near the defendant's apartment and that the laundry room was in disarray. In the laundry room, Z found a black and white flip flop sandal that matched one he had seen outside the building, a spent shell casing on the floor, and a bullet hole in the doorframe of the laundry room exit door. He also found what appeared to be a small, fresh blood like stain on the wall adjacent to the exit door of the laundry room. On the basis of his observations and the fact that C had discovered a knife, Z believed that someone may have been shot or stabbed. He proceeded to interview the residents of the building and determined that no one was injured. When he knocked on the door of the defendant's apartment, however, he received no response, discovered the door was locked when he tried to open it, and he could not see into the apartment because the blinds were closed. Z then called his superior officer, T, and explained the evidence and his belief that someone may be injured inside the defendant's apartment. T, along with other officers, responded to the scene and the decision was made to breach the defendant's apartment. A search revealed that no one was in the apartment but, while searching, Z observed in plain view two scales covered in white residue, clear plastic bags, and a safe in the closet. The officers then stopped searching and obtained a search warrant for the items in plain view. On appeal, the defendant claimed that the trial court improperly denied her motion to suppress the evidence seized by the police following the warrantless entry into her apartment because there were no exigent or emergency circumstances that permitted the officers to enter her apartment without a warrant. *Held*:

1. The trial court improperly concluded that the entry into the defendant's apartment was lawful under the exigent circumstances exception to the warrant requirement and improperly denied the defendant's motion to suppress; the facts found by the court did not provide an objective basis for the police to conclude that they had probable cause to enter the defendant's apartment as Z knew that the two men involved in the altercation had exited the building without entering the defendant's apartment, there was no evidence that a third party had been involved in the altercation, all the evidence of the altercation was found in the laundry room, the door to the defendant's apartment was locked and there was limited evidence that directly pertained to the apartment, and, in his 911 call, C stated that he did not believe that the residents of the defendant's apartment were home.

2. The trial court improperly concluded that the entry into the defendant's apartment was justified under the emergency doctrine and improperly denied the motion to suppress; there was no objectively reasonable basis for the police to believe that an emergency existed because, although Z had been responding to a possible burglary, there was no evidence to clearly demonstrate that a victim or bystander had been injured, as there were no witnesses who observed either individual involved in

the altercation enter the defendant's apartment nor was any individual observed leaving the defendant's apartment to engage in the altercation, there was no evidence that anyone had actually gained access to the defendant's apartment, the apartment door was locked, the small blood like stain found in the laundry room would not lead a reasonable police officer to believe that a person in a locked apartment in a separate area of the building was in need of immediate aid, especially when there was no blood like stains on or outside the apartment door or any bullet holes or shell casings, like those found in the laundry room, and, when viewed under the totality of the circumstances, the lack of response to Z's knocking would lead a reasonable officer to infer that the apartment was unoccupied, not that an emergency existed, and the fact that one hour passed from the time Z arrived on the scene to the time when the police entered the apartment made it more difficult to conclude that a reasonable officer would believe that an emergency existed, when considered under the totality of the circumstances, as, in that hour, Z did not discover any evidence clearly demonstrating that someone in the defendant's apartment was at risk of losing life or limb, there being no evidence regarding the defendant's whereabouts or whether there was any person inside the apartment.

(*One judge dissenting*)

Argued March 11—officially released September 8, 2020

*Procedural History*

Information charging the defendant with the crimes of possession of narcotics with intent to sell by a person who is not drug-dependent and operation of a drug factory, brought to the Superior Court in the judicial district of Waterbury, geographical area number four, where the court, *Cremins, J.*, denied the defendant's motion to suppress; thereafter, the state filed a substitute information charging the defendant with the crime of possession of narcotics with intent to sell; subsequently, the defendant was presented to the court, *Fasano, J.*, on a conditional plea of nolo contendere to the charge of possession of narcotics with intent to sell; judgment of guilty in accordance with the plea, from which the defendant appealed to this court. *Reversed*; *judgment directed.*

*Emily H. Wagner*, assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy Sedensky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Shaila M. Curet, appeals from the judgment of conviction rendered by the trial court following her conditional plea of nolo contendere[1] to the charge of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a) (1) (A). On appeal, the defendant claims that the court improperly denied her motion to suppress evidence seized by the police following a warrantless entry into her apartment because, under the totality of the circumstances, it was unreasonable for the police officers to believe that an emergency existed or exigent circumstances permitted warrantless entry into her apartment. We agree with the defendant and, accordingly, reverse the judgment of the court.

The court found the following facts in its ruling on the defendant's motion to suppress. On June 22, 2015, at approximately 3:55 p.m., Officer Raim Zulali of the Waterbury Police Department was dispatched to an apartment building at 130 Woodglen Drive (building) in Waterbury, in response to a complaint of burglary made by Anthony Cruz, a resident of the building. Cruz had called 911 and stated that he thought he heard two gunshots after he observed two men enter the building. Cruz indicated that one of the men was wearing a hooded sweatshirt and a baseball cap that he had pulled down over his face. He further stated to the operator that he believed that there was an altercation between the two men in the laundry room directly below his apartment. Cruz also stated that he believed someone tried to break into the defendant's apartment on the first floor because he found a knife in the laundry room and paint chips near the door of the defendant's apartment.[2] Lastly, Cruz informed the operator that the two individuals he originally observed had fled from the building in separate vehicles.

After receiving the dispatch, Zulali proceeded to the building. While en route, the display in his police cruiser indicated that someone had attempted to break into an apartment and that there had been significant noise coming from the laundry room, with the possibility of an altercation. The display also indicated that the 911 caller, Cruz, had discovered a knife. Zulali arrived at the building at 4 p.m. After arriving, Zulali called dispatch and requested that it contact Cruz because the door to the building was locked. After a few minutes, Cruz let Zulali into the building.

After entering the building, Zulali spoke with Cruz regarding his 911 call. Cruz stated that, from his window, he had observed a white vehicle parked along Woodglen Drive in front of the building. He then observed a male wearing a hooded sweatshirt and a baseball hat exit the driver's side of the vehicle and approach the front door to the building. As the male

approached the door, he pulled his baseball cap down and pulled the hood of his sweatshirt over his head. Cruz stated that this made him suspicious of the male because, in doing this, it appeared that the male was trying to conceal his identity. Cruz stated that he did not recognize the male.

Cruz further stated to Zulali that he believed the male might have used a knife to gain access to the building because it was locked. After the male gained entry to the building, Cruz said that he heard someone knocking very hard on the door of the defendant's apartment. He then heard an altercation that started in front of the hallway of the defendant's apartment and moved into the laundry room. The laundry room is located directly below Cruz' apartment and is just a few feet away from the defendant's apartment. Cruz stated that during the altercation in the laundry room, he heard what he believed to be two gunshots. He also stated that, after he heard the two gunshots, he saw one of the males run out of the front door of the building and enter the front passenger seat of the vehicle he had exited earlier and then the vehicle drove away, after which he saw the other male come out the back door and leave in a different car.

Cruz further informed Zulali that he had found a knife in the laundry room and had picked it up because he did not want one of the children in the building to get hurt. Cruz thought that the knife might have been used to get into the building and he stated that he thought one of the residents of the defendant's apartment was involved in the altercation.

During their discussion, Cruz informed Zulali that a male and a female resided in the defendant's apartment and that their vehicle was parked outside in the parking lot. Zulali checked the vehicle and did not see anyone in it. Also while outside, Zulali observed a black and white flip flop sandal.

Zulali then went back inside to investigate the hallway where the defendant's apartment is located. He observed pry marks and fresh paint chips on the floor near the defendant's apartment. He also observed fresh footprints on the wall of the hallway. Zulali then went into the laundry room to investigate, where he made several observations. First, the laundry room was in disarray and the washing and drying machines appeared to have been moved. Further, he saw a flip flop sandal in the laundry room that matched the black and white one he had seen outside of the building. Zulali also found a spent shell casing on the floor and observed a bullet hole in the doorframe of the laundry room exit door. He also found what appeared to be a fresh, blood like stain on a wall adjacent to the laundry room exit door that measured approximately one-half centimeter in diameter. Zulali also observed a fresh mark on the floor and a hole in the wall, which, through his training

and experience, he believed may have been from a ricocheted bullet from a firearm.

Under the totality of the circumstances and the information he gathered, Zulali believed that someone may have been shot or stabbed. Zulali then went door to door and interviewed the residents of the building who were home. After speaking with those residents and determining that no one was injured, he knocked on the door of the defendant's apartment. He did not receive a response after knocking several times, so he attempted to open the door to the defendant's apartment but it was locked. Zulali also attempted to look into the windows of the defendant's apartment, but the blinds were closed.

Zulali then called his superior officer, Sergeant Gaetano Tiso, and explained to him the evidence he found and his belief that someone might be in the defendant's apartment. Tiso and Officer Michael Garrity responded to the scene. Once they arrived at the scene, Zulali again relayed all of his findings to Tiso, along with his concern that someone injured may be in the defendant's apartment. The officers then requested that a dispatcher place calls to local hospitals to determine whether any gunshot or stabbing victims had been admitted for treatment. Shortly thereafter, approximately four other police officers arrived on the scene. The police officers did not wait for a response to their requested hospital check before the decision was made that an emergency existed that required the breach of the door to the defendant's apartment. Tiso retrieved a battering ram from his police vehicle and it was used to break down the door, at which point six officers, including Zulali and Tiso, entered the apartment. The time that had passed from when Zulali arrived at the building to the entry into the defendant's apartment totaled approximately one hour.

After a search of the defendant's apartment, it was determined that no one was in the one bedroom apartment. While searching the apartment, Zulali observed in plain view two scales covered in white residue, clear plastic bags, and a safe in the closet. At this point, the search stopped and a search warrant was sought for the items that were in plain view.

When the police executed the search warrant, they seized a total of approximately 186 small plastic bags containing cocaine weighing 123.5 grams, 2 plastic bags containing cocaine weighing 43.8 grams, and $41,720 in cash. The defendant was arrested and charged with possession of more than one-half ounce of cocaine in violation of General Statutes § 21a-278 (a) and operation of a drug factory in violation of § 21a-277 (c).

On June 30, 2017, the defendant filed a motion to suppress "any and all evidence seized and derived from the warrantless search of the defendant's apartment on

June 22, 2015." In her memorandum of law in support of the motion to suppress, the defendant argued that the exigent circumstances, emergency, or protective sweep exceptions to the warrant requirement did not apply under the facts and circumstances of the case. Specifically, the defendant contended that the exigent circumstances doctrine was not applicable because the Waterbury police did not have probable cause to enter her apartment, that the exigent circumstances doctrine did not control because it was not objectively reasonable for an officer to believe immediate action was necessary to prevent an exigent circumstance, that the protective sweep doctrine did not permit the warrantless entry into the defendant's home because no reasonable police officer would have believed that there was a dangerous individual inside, and that the emergency doctrine was inapplicable because no reasonable police officer would believe that there was an emergency requiring warrantless entry into her apartment.

The court held a hearing on the motion to suppress on July 14, 17, and 31, 2017. The state presented the testimony of Zulali and the defendant presented the testimony of Cruz. At the conclusion of the suppression hearing on July 31, 2017, the state argued that the emergency doctrine, the exigent circumstances doctrine, and the protective sweep doctrine justified the warrantless entry into the defendant's apartment. Specifically, the state argued that because probable cause existed, the police officers could enter the apartment under the exigent circumstance doctrine. Further, the state argued that because a reasonable officer could believe that someone's life was in danger, the officers were permitted to enter and search the apartment pursuant to the emergency and protective sweep doctrines.

On August 29, 2017, the court denied the defendant's motion to suppress in an oral decision. The court concluded that the officers' warrantless search in order to render immediate medical aid to someone that may have been involved in a shooting or stabbing was proper under the emergency and exigent circumstances doctrines. The court reasoned that, "[b]ased on the totality of the circumstances . . . a reasonable officer would have believed that an emergency existed, that an injured party might have been involved, [possibly] due to a shooting or stabbing and would be in need of immediate . . . medical attention" and, thus, warrantless entry was reasonable under the emergency and the exigent circumstances doctrines—two of the exceptions to the warrant requirement.[3] In reaching its decision, the court noted that it had relied on the testimony of Zulali and Cruz, including: Zulali's testimony that he received a burglary dispatch for an alleged altercation at the building; Cruz' testimony that he thought he heard two gunshots and observed two suspicious individuals enter the building; Zulali's testimony that he found two matching flip flop sandals, one outside the building and one

in the laundry room; Zulali's testimony that he located a knife and paint chips near the door to the defendant's apartment, spent shell casings in the laundry room, bullet markings on the wall and floor of the laundry room, and a blood like stain on the wall of the laundry room; Zulali's testimony that he spoke with all the residents of the building, other than those residing in the defendant's apartment; Zulali's testimony that he knocked on the door of the defendant's apartment and looked in the windows of that apartment but did not receive a response; Zulali's testimony that he observed fresh footprints on the wall of the hallway where the defendant's apartment was located; Zulali's testimony that the defendant's vehicle was parked in the parking lot; and Zulali's testimony that he believed someone in the defendant's apartment might be injured and in need of medical assistance.

On October 2, 2017, the defendant entered a conditional plea of nolo contendere to one count of possession of narcotics with intent to sell in violation of § 21a-277 (a) (1) (A). See General Statutes § 54-94a. The defendant's plea was entered conditionally with the reservation of her right to take an appeal from the court's ruling on the motion to suppress and the court, *Fasano, J.*, made a finding that the motion to suppress was dispositive of the case. Thereafter, the court, *Fasano, J.*, rendered a judgment of conviction. The court sentenced the defendant to a term of incarceration of three years, followed by eight years of special parole. This appeal followed.

We note that, "[a]s a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to

believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222–23, 100 A.3d 821 (2014).

I

The defendant claims first that Zulali's warrantless entry into her apartment was unlawful under the fourth and fourteenth amendments to the United States constitution and article first, § 7, of the constitution of Connecticut.[4] Specifically, she argues that the warrantless search was not justified by the exigent circumstances doctrine because there was no probable cause. The state counters that the search was justified by exigent circumstances because an objectively reasonable officer would have probable cause to believe that criminal activity occurred in the defendant's apartment and it was the location where an individual may be injured as a result of such criminal activity. We are not persuaded by the state's argument.

"Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception. . . . *Our law recognizes that there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers.* [For example], where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required. . . .

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . The test for determining whether exigent circumstances justify a warrantless search or seizure is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest [or entry] were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. . . .

"[N]o single factor, such as a strong or reasonable belief that the suspect is present on the premises, will be determinative in evaluating the reasonableness of a police officer's belief that a warrantless entry or arrest was necessary. Rather than evaluating the significance of any single factor in isolation, courts must consider all of the relevant circumstances in evaluating the reasonableness of the officer's belief that immediate action was necessary. . . .

"It is well established in Connecticut . . . that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry. . . . [T]he trial court's legal conclusion regarding the applicability of the exigent circumstances doctrine is subject to plenary review." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Correa*, 185 Conn. App. 308, 332–34, 197 A.3d 393 (2018), cert. granted on other grounds, 330 Conn. 959, 199 A.3d 19 (2019).

Before we reach our analysis of whether the exigent circumstances doctrine exception applied to the present facts, we must first determine whether, at the time of the Waterbury police's warrantless entry, probable cause[5] existed to search the defendant's apartment pursuant to the exigent circumstances exception. See *State* v. *Spencer*, 268 Conn. 575, 585–86, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004); *State* v. *Owen*, 126 Conn. App. 358, 366, 10 A.3d 1100, cert. denied, 300 Conn. 921, 14 A.3d 1008 (2011). We conclude that it did not.

"Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Reasonable minds may disagree as to whether a particular affidavit establishes probable cause. . . .

"We consistently have held that [t]he quantum of

evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . .

"The determination of whether probable cause exists under the fourth amendment to the federal constitution . . . is made pursuant to a totality of circumstances test. . . . The probable cause test then is an objective one. . . . This court must not attempt a de novo review where there has already been a determination at a suppression hearing that probable cause exists." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa*, supra, 185 Conn. App. 334–35.

In the present case, the defendant asserts that no reasonable officer would believe that probable cause existed to enter her apartment. Specifically, she asserts that "the trial court found that the officers knew there had been an altercation between two men and also knew that both parties fled the apartment complex," thus, there was no basis on which a reasonable officer would believe that probable cause justified entry in pursuit of a suspect pursuant to the exigent circumstances doctrine. Because we agree with the defendant, and for the reasons discussed below, we conclude that the police lacked probable cause to enter the defendant's apartment.

The facts found by the court do not provide an objective basis for the police to have concluded that they had probable cause to enter the defendant's apartment. First, as previously stated, Zulali knew that two men entered the building, that an altercation ensued, and that the two men who entered the building had subsequently exited it without entering the defendant's apartment. No evidence existed that a third party had been involved in the alleged altercation. Second, the altercation occurred in the laundry room. Additionally, evidence of the altercation, including the knife, the flip flop sandal, shell casings, bullet holes, and the blood like stain, all were found in the laundry room. Third, during Cruz' 911 call, he stated to the operator that he did not believe the residents of the defendant's apartment were inside the apartment at that time. Fourth, there was limited evidence that directly pertained to the defendant's apartment, including pry marks and paint chips near the defendant's apartment door and

Zulali's admission that the door to the defendant's apartment was locked. Thus, there was no reasonable basis to conclude that any activity deriving from the altercation between the two men had occurred in the defendant's apartment. Accepting these facts, it is unlikely that an objectively reasonable officer would conclude that he or she had probable cause to enter the defendant's apartment.

## II

The defendant claims next that the court improperly concluded that Zulali's warrantless entry into her apartment was justified under the emergency doctrine. Specifically, she argues that, on the basis of the facts, a reasonable officer could not conclude that entry was necessary to alleviate an emergency. The state counters that it was objectively reasonable for an officer to believe that a person within the defendant's apartment was injured and required immediate assistance pursuant to the emergency doctrine. We are not persuaded by the state's argument.

"It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met. Indeed, [p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed. . . .

"Searches conducted pursuant to emergency circumstances are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. . . . [T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving a prompt warrantless search of the area to see if there are other victims . . . still on the premises. . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search. . . .

"It is well established in Connecticut that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. . . . Specifically, the state actors making the search *must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat.* . . . The police, in order to avail themselves of this exception, must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings. . . . The test is not whether the

officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. . . . The reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry. . . . [T]he emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is assessed on a case-by-case basis. . . . The three general categories that the courts have identified as justifying the application of the doctrine are danger to human life, destruction of evidence and flight of a suspect. . . .

"Direct evidence of an emergency is not required because the emergency exception to the warrant requirement arises out of the caretaking function of the police. It has been observed that [t]he police have complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses; by design or default, the police are also expected to reduce the opportunities for the commission of some crimes through preventive patrol and other measures, aid individuals who are in danger of physical harm, assist those who cannot care for themselves, resolve conflict, create and maintain a feeling of security in the community, and provide other services on an emergency basis. . . . As [our Supreme Court] previously has noted, the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 534–37, 88 A.3d 491 (2014).

Application of these principles leads us to conclude that the entry of the six Waterbury police officers into the defendant's apartment was not justified by the emergency doctrine because a reasonable officer would not have believed that an emergency involving danger to human life existed in the apartment. The state argues that in the court's oral decision on the defendant's motion to suppress, it found that there were specific factors that led Zulali to conclude that there was an emergency in the defendant's apartment requiring a warrantless entry. We will examine each of these factors in turn. We note, however, that no single factor is determinative and, after examining these factors, we

will consider all of them under the totality of the circumstances to evaluate the reasonableness of Zulali's belief that immediate action was necessary. See *State* v. *Kendrick*, supra, 314 Conn. 229.

The first factor that the state claims supports the police's warrantless entry was that Zulali was responding to a possible burglary and an altercation between two males. The state claims that because "burglary is a crime of violence and bystanders are likely to be injured by the perpetrator," it was reasonable for the police to believe that someone in the defendant's apartment was injured. In its brief, the state cites *State* v. *Fausel*, 295 Conn. 785, 798, 993 A.2d 445 (2010) in support of this claim.

In *Fausel*, a police officer observed a vehicle with a license plate attached to the rear bumper with what appeared to be plastic ties and ran its plate number. Id., 788. The plate number, which came back as expired, was also tied to a different vehicle. The owner of the plate had prior arrests for narcotics and weapons. Id. The officer attempted to approach the vehicle but the operator of the vehicle fled at a high rate of speed. Id., 788–89. The officer then radioed a description of the vehicle and operator to the police dispatcher. Id., 789. The police later discovered that the vehicle had stopped at a residential property. Id., 789. Witnesses told police officers that they had observed the operator of the vehicle enter the residence. Id. The police then knocked on the door but did not receive a response. Id. Eventually, the operator of the vehicle appeared and surrendered to the police. Id. The police entered the residence without a warrant to determine if anyone else was present, injured or if there were any remaining threats. Id. During their sweep, the police identified bags of crack cocaine for which the police later obtained a warrant and seized. Id. The defendant, the owner of the residence, thereafter filed a motion to suppress, claiming that the police improperly entered the residence without a warrant. Id., 790. The trial court denied the motion, which the defendant appealed to this court and, thereafter, upon certification, to our Supreme Court. Id., 791–92. Our Supreme Court concluded that the police were justified in entering the residence under the emergency doctrine because a reasonable police officer could conclude that, on the basis of the individual's "criminal history with weapons and drugs, his extreme attempt to avoid arrest, his reluctance to surrender, and his lack of any apparent connection with the house and its residents," it was necessary to enter the residence immediately to ensure that no one was injured. Id., 798.

The facts of the present case are distinguishable from those in *Fausel*. In the present case, the police did not have knowledge of the identities of the individuals who entered the building. Thus, Zulali was unaware of any

prior criminal history involving these individuals. Further, although Cruz observed these individuals enter the building, there was no witness in the present case who observed either individual enter the defendant's apartment, nor did a witness observe anyone emerge from the defendant's apartment to engage in the altercation. Additionally, there was no evidence demonstrating that someone had breached the door to the defendant's apartment. The pry marks and paint chips that Zulali observed demonstrate that someone had attempted to enter the defendant's apartment but was unsuccessful. Also, Zulali tried but could not open the door to the defendant's apartment. Moreover, Zulali received information that two individuals had entered the building, engaged in an altercation, and then fled from the building in separate vehicles. Zulali was unaware of any evidence that a third party was involved in the altercation and remained in the building or was located in the defendant's apartment. Although crimes like burglary are "likely to involve danger to life in the event of resistance by the victim"; *State* v. *Fausel*, supra, 295 Conn. 798; the evidence in the present case does not clearly demonstrate that there was a victim or bystander that was injured. Further, there was no evidence that the door to the defendant's apartment was breached and that a burglary occurred therein. Instead, the evidence suggests that the attempted entry into the defendant's apartment was unsuccessful and the door was not breached.

The second factor that the state claims supports the police's warrantless entry was the fact that Zulali observed a blood like stain and bullet holes in the laundry room. The state, citing to *State* v. *Blades*, 225 Conn. 609, 621, 626 A.2d 273 (1993), claims that this blood like stain " 'further heightened' [the] belief that a person might be in need of immediate aid."

In the present case, Zulali testified that he observed what he believed to be a blood like stain in the laundry room, approximately one-half centimeter, or less than one-quarter inch, in size. Furthermore, Zulali observed bullet holes, a shell casing, a flip flop sandal and a knife in the laundry room. The state claims that the blood like stain in the present case would lead a reasonable officer to conclude that someone may be in immediate need.

During the hearing on the defendant's motion to suppress, the court found that the blood like stain that Zulali observed in the laundry room measured one-half centimeter. Also during the hearing, Zulali testified that, aside from the one-half centimeter blood like stain he observed on the wall of the laundry room, he did not observe any other blood like marks in the building. Furthermore, Zulali testified that, as a police officer and first responder, he had responded to many medical calls, and that his training and experience contributed

to his decision in determining that someone may have been in need of immediate medical attention. We disagree with the state that this one-half centimeter blood like stain would lead a reasonable officer to believe that a person in a locked apartment in a separate area of the building might be in need of immediate aid. There were neither blood like stains on or outside of the door to the defendant's apartment or leading into the hall toward the direction of the defendant's apartment, nor were there any bullet holes or shells near the door to the defendant's apartment. Thus, a reasonable officer with first responder training commensurate to that of Zulali might likely conclude that there was an altercation in the laundry room and someone might have been injured *in the laundry room* as a result of the altercation but not that someone in the defendant's apartment required emergency medical assistance. The court did not find any facts supporting a theory or conclusion that an injured person in the laundry room retreated to the defendant's apartment or that the *one-half centimeter* blood like stain and other evidence in the laundry room supported the theory that an individual in the defendant's apartment was in need of emergency medical assistance.

The third factor that the state claims supports the police's warrantless entry was the lack of response that Zulali received when knocking on the defendant's apartment and his inability to observe conditions inside the apartment, in conjunction with the fact that there was an unoccupied car parked in the building's parking lot that allegedly belonged to the defendant. The state argues that these elements "increased the chances that there was a person inside the apartment who was unresponsive as the result of an injury . . . ." The state relies on our Supreme Court's decision in *State* v. *DeMarco*, supra, 311 Conn. 510, to support its argument that a warrantless entry is reasonable on the basis of vehicles on the premises and an inability to look through windows to observe the interior of the residence.

In *DeMarco*, an animal control officer from the Stamford Police Department responded to complaints relating to the defendant's keeping of animals in his residence. Id., 513. The officer left a notice on the front door and a notice on the windshield of an automobile that the defendant typically drove. Id., 539. During that visit, a neighbor informed the officer that the neighbor had not seen the defendant in several days. Id. Thereafter, the officer attempted to reach the defendant by phone but was unsuccessful. Id. The officer returned the next week and observed that the notice was still on the vehicle's windshield and the notice on the door was now lying on the floor of the porch. Id. He also observed that the defendant's mailbox was overflowing with current and dated mail. Id. The officer could hear dogs barking from within the residence and smelled a terrible odor emanating therein. Id. The officer called

for backup and attempted to look through the windows but was unsuccessful because the windows were too dirty. Id., 539–40. Firefighters also arrived and determined that the smell could be life threatening and entered the residence. Id., 540.

Our Supreme Court concluded that, on the basis of the notices, the mail that had piled up, "the putrid, overwhelming odor" and the same unmoved vehicle on the premises, a reasonable police officer would believe that an emergency existed inside the defendant's home. Id. Thus, in *DeMarco*, the fact that the defendant's vehicle had remained unmoved for more than one week was a relevant factor *of many* when viewed through the lens of the totality of the circumstances that justified the warrantless entry of the defendant's residence.

In the present case, when viewed under the totality of the circumstances, the fact that the defendant's alleged vehicle was in the parking lot does not support the conclusion that it was reasonable to believe that an emergency existed in the defendant's apartment. Furthermore, when viewed in conjunction with the fact that no one answered when Zulali knocked on the door to the defendant's apartment, the fact that there was an unoccupied vehicle in the parking lot allegedly belonging to the defendant does not support the inference that there was an emergency in the defendant's apartment. Rather, on the basis of these facts and those discussed previously, a reasonable officer might infer that the defendant's apartment was unoccupied. See *State* v. *Ryder*, 301 Conn. 810, 830–31, 23 A.3d 694 (2011); *State* v. *Geisler*, 222 Conn. 672, 695, 610 A.2d 1225 (1992).

Lastly, the court, in its ruling on the defendant's motion to suppress, found that one hour had elapsed from the time when Zulali arrived at the building to when the six police officers entered the defendant's apartment. We note that the amount of time elapsed is not a dispositive factor in determining the existence of an emergency but one that, when viewed in the totality of the circumstances, makes it more difficult to conclude that a reasonable officer could believe that after the lapse of one hour, an emergency existed in the defendant's apartment in circumstances in which there was no evidence of activity in the apartment. Our Supreme Court's decision in *State* v. *Blades*, supra, 225 Conn. 609, is helpful to our analysis of this factor.

In *Blades*, the wife of the defendant had been missing for a period of time. Id., 613. Family members of the defendant's wife called the New London Police Department expressing their concern. Id. During those phone calls, the police were made aware of the tempestuous relationship between the defendant and his wife. Id., 620. To investigate, the officer called various parties, including the employer of the defendant's wife, and learned that her daughter had also called the employer

looking for her. Id., 615. After two hours had passed and the officer had determined that the defendant's wife was missing or may be in danger, the officer traveled to the defendant's apartment, where he gained entry into the apartment and entered the apartment without a warrant. Id., 613. Inside the apartment the officer discovered the defendant's wife, who had been murdered by the defendant. Id.

In that two hour time period in *Blades*, the officer knocked on the defendant's apartment door and identified himself, to which the defendant responded "[m]y wife is in New York"; there were several concerned relatives that called the police and reported that the defendant likely provided a false narrative for his wife's disappearance; the officer contacted the employer of the defendant's wife and learned that she was not there and others had called looking for her; there was a long history of domestic abuse between the defendant and his wife; and the officer observed blood on the interior side of the back door to the building where the defendant's apartment was located. Id., 613–17. Thus, on the basis of this information, the officer concluded that "there was reason to believe that someone was injured or in danger in the apartment and that it would be necessary to enter to protect or preserve life." Id., 616. Our Supreme Court concluded that on the basis of these facts, the police's entry into the defendant's apartment under the emergency doctrine was valid. Id., 624.

In contrast to *Blades*, Zulali did not discover any evidence in the present case that clearly demonstrated that someone in the defendant's apartment was at risk of losing life or limb. In the one hour that elapsed from the time he arrived to the time that the door of the defendant's apartment was breached, he found no evidence relating to the whereabouts of the defendant or whether there was any person in the apartment. Although in that time period Zulali had interviewed all of the residents in the building, the residents were reluctant to provide Zulali with information but confirmed that they were fine. Zulali did not learn anything new from interviewing the residents of the building. Thus, unlike in *Blades*, where the officer had discovered substantial evidence during his investigation clearly demonstrating that someone was in danger of losing life or limb, Zulali did not glean from his investigation evidence that demonstrated that a warrantless entry was necessary.

While the emergency exception does not require direct evidence of an emergency situation, it does "require, however, that officers know *some* facts at the time of entry that would lead them to reasonably conclude that they could dispense with the necessity of obtaining a warrant supported by probable cause in accordance with the dictates of the fourth amendment." (Emphasis in original.) *State* v. *Ryder*, supra, 301 Conn.

830. Further, the emergency exception requires that the police have "an objectively reasonable basis for believing that an occupant is seriously injured"; (internal quotation marks omitted) *State* v. *Fausel*, supra, 295 Conn. 794; or reason to believe "that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." (Internal quotation marks omitted.) Id., 795. In the present case, there was no objectively reasonable basis for the police to believe that someone in the defendant's apartment was seriously injured or that life or limb was in immediate jeopardy.[6] Thus, taking all the circumstances into consideration, we conclude that the court's conclusion that it was objectively reasonable for the police to believe that an emergency existed in the defendant's apartment, thus justifying the warrantless entry, was not supported by substantial evidence. The warrantless entry into the defendant's apartment when there was no objectively reasonable basis for believing that an emergency existed violated her rights under the fourth amendment to the United States constitution.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and to render judgment dismissing the charge of possession of narcotics with intent to sell.

In this opinion DEVLIN, J., concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[2] In its ruling on the defendant's motion to suppress, the court relied on Cruz' 911 call. During that phone call, Cruz stated to the operator that he did not believe that anyone presently was in the defendant's apartment.

[3] In its decision on the defendant's motion to suppress, the court stated that, in its opinion, "the emergency doctrine and the doctrine of exigent circumstances are the key concepts relevant in this particular case." Thus, the court denied the defendant's motion to suppress on the basis of the exigent circumstances and emergency doctrines. Accordingly, we do not review whether the protective sweep doctrine was applicable in the present case as the state has not offered it as an alternative basis on which to sustain the court's denial of the motion to suppress.

[4] Although the defendant claims a due process violation under our state constitution, she does not provide a separate analysis thereunder or argue that the Connecticut constitution provides greater protection than the federal constitution. Accordingly, review of her claims is limited to the federal constitution. See *State* v. *Johnson*, 288 Conn. 236, 244 n.14, 951 A.2d 1257 (2008).

[5] We note that the court did not address the issue of whether the police had probable cause to enter the defendant's apartment. Instead, the court concluded that exigent circumstances permitted the warrantless entry to the defendant's apartment. On appeal, however, we may apply the undisputed factual findings of the court's ruling on the defendant's motion to suppress "because whether a set of facts is sufficient to satisfy the probable cause standard is subject to plenary review . . . ." *State* v. *Jones*, 320 Conn. 22,

70 n.26, 128 A.3d 431 (2015). Thus, the court's factual findings are sufficient for our determination of whether probable cause existed to allow the warrantless entry under the exigent circumstances doctrine.

[6] The most reasonable interpretation of the facts is that two men, after entering the building, unsuccessfully attempted to enter the defendant's apartment.

---